## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DANIEL COVAL,

              Plaintiff,

v.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN,
LISA ARMSTRONG, *in her official and
individual capacity*, and PAULA PERNIA,
*in her official and individual capacity,*
DOMENICO GRASSO, *individually and in his
official capacity as Interim President of
the University of Michigan,*

              Defendant.

Case No.

Hon.

---

David A. Nacht (P47034)
NACHTLAW, P.C.
*Attorneys for Plaintiff*
501 Avis Drive, Suite 3
Ann Arbor, Michigan 48108
(734) 663-7550
dnacht@nachtlaw.com

---

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

    NOW COMES Plaintiff Daniel Coval ("Plaintiff"), by and through

undersigned counsel, NACHTLAW, P.C., and hereby respectfully submits the

following:

## INTRODUCTION

1. Plaintiff is a 67-year-old individual.

2. This case is an action for age discrimination and retaliation in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") against Defendant the Board of Regents of the University of Michigan ("Defendant UM"), Defendant Paula Pernia ("Defendant Pernia"), Defendant Lisa Armstrong ("Defendant Armstrong"), and Defendant Domenico Grasso ("Defendant Grasso").

3. This case is also an action for disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and Section 504 of the Rehabilitation Act, 28 U.S.C. § 794, *et seq.* ("Section 504") against Defendant.

4. But for Plaintiff's age and disabilities, Defendants would not have constructively discharged him, forcing him to leave an over 12-year-old career.

## PARTIES, JURISDICTION, AND VENUE

5. Plaintiff is a 67-year-old man, residing in Manchester, Washtenaw County, Michigan.

6. Defendant UM is a public research university located in Ann Arbor, Washtenaw County, Michigan.

7. During all relevant times, Defendant Armstrong was Defendant UM's Department Manager within its Electrical and Computer Engineering Department.

2

8.     During all relevant times, Defendant Pernia was Defendant UM's Facilities Manager within its Electrical and Computer Engineering Department.

9.     Defendant Domenico Grasso is an individual who, upon information and belief, resides in the State of Michigan. He was appointed as the Interim President of the University of Michigan on May 8, 2025. Plaintiff brings claims against Defendant Grasso in both his individual and official capacities. As Interim President, Defendant Grasso has final or delegated authority over employment decisions at the University of Michigan and is therefore a proper party to Plaintiff's claims for injunctive relief.

10.     This action arises from a violation of the ADEA, ADA, and Section 504 and as such, this Court has original, federal question jurisdiction pursuant to 28 U.S.C. § 1331 and federal civil rights jurisdiction pursuant to 28 U.S.C. § 1343.

11.     Venue is appropriate under 28 U.S.C. § 1391(b)(1) and (2), as a substantial part of the events or omissions giving rise to the claims occurred therein.

## **CONDITIONS PRECEDENT**

12.     Plaintiff has exhausted his administrative remedies by filing charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").

13.     On October 22, 2024, Plaintiff filed with the EEOC a charge of discrimination against Defendant UM relating to the constructive discharge of his employment, being Charge No. 471-2025-00521.

14.     The EEOC issued a right to sue letter to Plaintiff for Charge No. 471-2025-00521 on April 21, 2025.

15.     Plaintiff files this action within the applicable statute of limitations.

16.     All conditions precedent to this action have been satisfied and/or waived.

## FACTUAL BACKGROUND

17.     Plaintiff incorporates by reference herein the allegations contained in the foregoing paragraphs.

### *For Over a Decade, Plaintiff Received Primarily Positive Work Performance Reviews as a Facilities Assistant for Defendant UM*

18.     Defendant UM hired Plaintiff as a part time, seasonal Facilities Assistant within its Electrical and Computer Engineering ("ECE") Department in May 2011.

19.     During his time as Defendant UM's part-time, seasonal Facilities Assistant, Plaintiff received primarily positive reviews.

20.     As a result, Defendant UM, through its ECE Facilities Manager, Defendant Paula Pernia ("Defendant Pernia"), hired Plaintiff as a full time, permanent Facilities Assistant in 2012.

4

21.    During his time as Facilities Assistant, the ECE Department regularly notified Plaintiff of pending tasks before Plaintiff either completed the tasks himself or delegated the tasks to another facilities worker.

22.    For over a decade, Plaintiff worked within the ECE Department as a Facilities Assistant, gaining valuable experience and contributing to the department's importance to the university.

### In 2020, Defendant UM Began Targeting Plaintiff After He Took Medical Leave for the First Time

23.    By 2020, Plaintiff was 62 years old—almost 10 years older than he was when Defendant UM first hired him.

24.    On December 16, 2020, Plaintiff had left knee surgery for the first time.

25.    Per his doctor's orders, Plaintiff took medical leave from December 16, 2020, until February 15, 2021.

26.    Plaintiff's doctor confirmed that, following his medical leave, he could return to work.

27.    While Plaintiff was still on medical leave, however, Defendant Pernia texted him an out-of-department, non-construction job position, suggesting that Plaintiff apply.

28.    Plaintiff understood that Defendant Pernia had now perceived him as "too old" and "likely to get injured" if he continued to work in construction labor.

29.     At this point, notwithstanding his recent surgery and disability, Plaintiff did not want to stop working as a Facilities Assistant within Defendant UM's ECE Department.

30.     Plaintiff was still qualified to work as a Facilities Assistant.

31.     Additionally, Plaintiff was passionate about construction equipment and enjoyed completing his assigned electrical and mechanical tasks.

32.     Plaintiff had hoped to retire from Defendant UM's ECE Department, or a similar department requiring construction labor.

33.     However, Defendant Pernia suggested that Plaintiff apply as a Bus Driver for Defendant UM—a position that paid less than the Facilities Assistant position and did not offer opportunities for construction labor.

34.     Given Plaintiff's desire to continue working in construction labor, Plaintiff did not apply for the out-of-department, non-construction job position that Defendant Pernia had texted him.

35.     When Plaintiff completed his medical leave and returned to work in February 2021, Defendant Pernia and Defendant Pernia's supervisor, Defendant UM's ECE Department Manager Lisa Armstrong ("Defendant Armstrong"), failed to notify Plaintiff of tasks, effectively misrepresenting Plaintiff's capabilities in the workplace.

36.    Upon reason and belief, Defendant Pernia and Defendant Armstrong were intentionally sabotaging Plaintiff as an attempt to remove him from his Facilities Assistant position because of his age and disability.

37.    Yet Plaintiff persevered with his treatment and continued working.

### *In 2022, After Plaintiff Took Medical Leave for the Second Time, Plaintiff's Treatment Worsened*

38.    By 2022, Plaintiff was 64 years old.

39.    In May 2022, Plaintiff had surgery on his shoulder, requiring several months of recovery.

40.    While he was on medical leave for his shoulder, Defendant Pernia again texted Plaintiff out-of-department, non-construction job postings and suggested that he apply to them.

41.    Like before, Plaintiff refused to apply for these out-of-department job postings because he wanted to remain a Facilities Assistant or at least within a construction labor department.

42.    Upon Plaintiff's return to the ECE Department after his medical leave, Plaintiff discovered that Pernia had hired a younger worker named Alex to "assist" Plaintiff.

43.    During this time, Plaintiff was in his 60s and, upon reason and belief, Alex was in his 20s.

7

44.     At no point did Plaintiff request assistance or indicate that he was no longer capable of effectively completing his tasks following his medical recovery.

45.     However, Defendant UM still assigned Plaintiff Alex to "assist" Plaintiff.

46.     Rather than "assisting" Plaintiff and following's Plaintiff's direction, Alex refused to listen to Plaintiff.

47.     Alex was repeatedly insubordinate towards Plaintiff in the workplace.

48.     Further, on more than one occasion, Alex falsely accused Plaintiff of stealing some of Alex's personal belongings.

49.     Plaintiff did not steal Alex's personal belongings.

50.     Additionally, Alex lacked any evidence to prove that Plaintiff ever stole anything from him.

51.     Alex's false allegations against Plaintiff caused Plaintiff mental and emotional distress.

52.     A workplace that Plaintiff once enjoyed became worrisome; Plaintiff worried about any effects these false allegations could have on his reputation in the workplace.

53.    In 2023, Plaintiff applied for both the Elevator Mechanic Apprenticeship and Construction Labor position—two positions that offered construction labor.

54.    At this point, Plaintiff had worked for Defendant UM for over a decade and had several years of construction labor experience.

55.    Plaintiff was qualified to work as both an Elevator Mechanic Apprentice and Construction Laborer.

56.    As emphasized in his cover letter for both positions, Plaintiff had co-created and instituted a logistic process that monitored and tracked both incoming and outgoing packages for Defendant UM's ECE Department, greatly reducing the number of delivery errors and lost packages.

57.    Plaintiff also completed courses at Washtenaw Community College, including but not limited to Motorcycle Service Technology, Auto Body Repair, and Powder Coating, to expand his knowledge of electrical and motor processes.

58.    Although he was qualified for both positions, Plaintiff did not receive an offer for either.

59.    At this point, Plaintiff was 64 years old.

60.    Throughout his time as a Facilities Assistant, Plaintiff applied for 16 construction labor jobs at Defendant UM and was denied each position.

61.    Upon reason and belief, Plaintiff was oftentimes, if not always, the oldest applicant.

### By 2023, Plaintiff Reported Discrimination in the Workplace

62.    At this point, Plaintiff believed that Defendant UM repeatedly denied his applications for promotional opportunities because of his old age.

63.    Accordingly, in April 2023, Claimant filed an age discrimination complaint with Defendant UM's Equity Civil Rights and Title IX office ("ECRT").

64.    Defendant UM's ECRT determined that there were so–called "legitimate, nondiscriminatory reasons" as to why Plaintiff's 16 job applications were each denied.

65.    Defendant UM's ECRT, however, failed to further explain what these so-called "legitimate nondiscriminatory reasons" were.

### Following Plaintiff's Third Time Taking Medical Leave in 2023, Defendant UM Retaliated Against Him

66.    Later that year, in November 2023, Plaintiff had another knee surgery.

67.    In accordance with company policy, Plaintiff notified Defendant UM of his expected surgery in advance.

68.    The day before Plaintiff's surgery was scheduled, Defendant Pernia sent Plaintiff yet another out-of-department, non-construction, lower-paying job posting.

69.    Plaintiff, like before, was not interested in working for a non-construction department, inapplicable to his prior work experience and passions.

10

70.    Accordingly, as before, Plaintiff did not apply for the out-of-department job posting that Defendant Pernia had sent to him.

71.    Then, in January 2024, soon after Plaintiff returned to work following his medical leave, he was suddenly placed on a performance improvement plan ("PIP").

72.    Plaintiff had *never* received a PIP before he reported age discrimination to Defendant UM's ECRT.

### *In 2024, Plaintiff Again Reported Discrimination in the Workplace*

73.    On or around May 21, 2024, Plaintiff filed another complaint with Defendant UM's ECRT, stating that Defendant UM's ECE department was targeting and removing its older employees from its workforce.

74.    At this time, Plaintiff reported that he had watched Defendant UM target four employees due to age, including but not limited to Defendant UM's former employee Melanie Caughey, before Defendant UM started to target Plaintiff as well.

75.    Following Plaintiff's second discrimination report, Plaintiff's treatment worsened.

76.    Thereafter, Defendants Pernia and Armstrong started to comment on Plaintiff's retirement benefits and withhold the vital information he needed to properly perform his job duties.

77.     During the week of May 20, 2024, Defendant Armstrong emailed Plaintiff something to the effect of he could "just go home" and "the only reason [Defendant UM] hired [Plaintiff] is because [Defendant UM] did not expect [Plaintiff] to use any employee benefits, including medical leave."

78.     Throughout that same week, Defendant UM assigned Plaintiff's tasks to Mark Schaffer.

79.     During all relevant times, Schaffer was in his 20s while Plaintiff was in his 60s.

80.     By late May 2024, Plaintiff understood that Defendant UM was essentially replacing him with Schaffer, someone who was about 40 years younger than Plaintiff and someone who Plaintiff had trained.

81.     Additionally, Defendants Pernia and Armstrong grew more verbally hostile towards Plaintiff, adding more stress and worry to Plaintiff.

82.     By May 30, 2024, a 66-year-old Plaintiff resigned from Defendant UM to escape Defendant UM's intolerable workplace.

83.     When his coworkers asked him why he was leaving, Plaintiff said "I don't want to leave, but I don't like how they [Defendant Pernia and Defendant Armstrong] are treating me."

84.     Plaintiff was replaced by a man named Mark Schaffer, who is in his 20s.

12

## COUNT I
### Age Discrimination in Violation of the ADEA
*(Against Defendants Armstrong, Pernia, and Grasso for Injunctive Relief)*

85.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

86.     At all relevant times, Defendant UM was an employer, Defendants Armstrong, Pernia, and  Grasso were agents of Defendant UM, and Plaintiff was an employee within the meaning of and covered by the ADEA.

87.     Plaintiff is a member of a protected class as a 67-year-old individual.

88.     Defendants' actions were motivated by unlawful discrimination against Plaintiff because of his age.

89.     Defendants subjected Plaintiff to adverse employment actions, including but not limited to failing to internally hire him for other positions and constructively discharging him from his employment, because of his age.

90.     Any other basis purported by Defendants for Plaintiff's failure to hire and constructive discharge is pretextual.

91.     But for Plaintiff's age, Defendants would not have subjected Plaintiff to such adverse employment actions.

92.     Defendants acted willfully and intentionally when it violated the ADEA.

93.     As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, loss of employment, career opportunities, earnings, and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to so suffer in the future.

### COUNT II
### Retaliation in Violation of the ADEA
*(Against Defendants Armstrong, Pernia, and Grasso for Injunctive Relief)*

94.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

95.     At all relevant times, Defendant UM was an employer, Defendants Armstrong, Pernia, and  Grasso were agents of Defendant UM, and Plaintiff was an employee within the meaning of and covered by the ADEA.

96.     Plaintiff is a member of a protected class as a 67-year-old individual.

97.     Plaintiff engaged in protected activity under the ADEA when he reported age discrimination to Defendants in both 2023 and 2024.

98.     Defendants discriminated and retaliated against Plaintiff because of his report by targeting him and constructively discharging his employment.

99.     Defendants acted willfully in violating the ADEA.

100.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not

limited to, loss of employment, career opportunities, earnings, and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to suffer in the future.

### COUNT III
**Disability Discrimination in Violation of the ADA**
*(Against Defendants Armstrong, Pernia, and Grasso for Injunctive Relief)*

101.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

102.   At all relevant times, Defendant UM was an employer, Defendants Armstrong, Pernia, and  Grasso were agents of Defendant UM, and Plaintiff was an employee within the meaning of and covered by the ADA.

103.   During all relevant times, Plaintiff was disabled within the meaning of 42 U.S.C. § 12101, which substantially limited his major life activities.

104.   Despite his disabilities, Plaintiff was at all relevant times qualified to perform the essential functions of his job with reasonable accommodation.

105.   Defendants discriminated against Plaintiff because of his disability by targeting, failing to internally hire him for other positions, and eventually constructively discharging him.

106.   Defendants acted willfully in violating the ADA.

107.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not

limited to, loss of employment, career opportunities, earnings, and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to suffer in the future.

<u>**COUNT IV**</u>
**Disability Discrimination in Violation of Section 504**
*(Against Defendants Armstrong, Pernia, and Grasso for Injunctive Relief)*

108.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

109.   At all relevant times, Defendant UM was an employer, Defendants Armstrong, Pernia, and Grasso were agents of Defendant UM, and Plaintiff was an employee within the meaning of and covered by Section 504.

110.   During all relevant times, Plaintiff was disabled within the meaning of 28 U.S.C. § 794, which substantially limited his major life activities.

111.   Despite his disabilities, Plaintiff was at all relevant times qualified to perform the essential functions of his job with and without reasonable accommodation.

112.   Defendants discriminated against Plaintiff because of his disability by targeting him, failing to internally hire him for other positions, and eventually constructively discharging him.

113.   Defendants acted willfully in violating Section 504.

16

114.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, loss of employment, career opportunities, earnings, and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to suffer in the future.

## COUNT V
### Violation of Due Process Under 42 U.S.C. § 1983
*(Against All Defendants)*

115.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

116.   The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that "no state shall… deprive any person of life, liberty, or property, without due process of law."

117.   42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by person acting under the color of law.

118.   Plaintiff had a constitutionally protected interest in his reputation and continued employment at Defendant UM.

119.   Defendants placed Plaintiff on a baseless PIP and regularly used such language to clearly establish that they intended to terminate Plaintiff.

120.    Defendants' arbitrary and capricious decision to deprive Plaintiff of his interests without adequate process of law represents a due process violation.

121.    Additionally, when Plaintiff reported his disparate treatment based on age to Defendant UM's ECRT, Defendants engaged in a biased investigation without adequate due process.

122.    Defendants provided barely any information regarding their so-called investigation into Plaintiff's report. (**Ex. A**)

123.    Defendants' inadequate investigation deprived Plaintiff of his due process rights.

124.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, loss of employment, career opportunities, earnings, and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to suffer in the future.

## <u>RELIEF REQUESTED</u>

For all the foregoing reasons, Plaintiff Daniel Coval demands judgment against Defendant as follows:

a.  Declare the practices and actions of Defendant as unlawful employment practices in violation of the ADA, Section 504, and the ADEA;

b.  Award injunctive relief, including reinstatement of Plaintiff's job;

18

c.  Declare the practices and actions of Defendant as violations of Plaintiff's
    due process rights, in violation of the Fifth and Fourteenth Amendments of
    the U.S. Constitution;

d.  Award compensatory damages for monetary and non-monetary loss in
    whatever amount Plaintiff is found to be entitled;

e.  Award exemplary damages in whatever amount Plaintiff is found to be
    entitled;

f.  Award lost wages and benefits, past and future, and front pay in whatever
    amount Plaintiff is found to be entitled;

g.  Award emotional distress damages;

h.  Award interest, costs, and reasonable attorney fees; and

i.  Award whatever other equitable relief this Court finds appropriate.

## <u>DEMAND FOR TRIAL BY JURY</u>

NOW COMES Plaintiff Daniel Coval, by and through his attorneys,
NACHTLAW, P.C., and hereby demands a trial by jury in the above-captioned
matter for all issues so triable.

Respectfully submitted,

**NACHTLAW, P.C.**

/s/ David A. Nacht
David A. Nacht (P47034)
*Attorney for Plaintiff*

19

Dated: July 21, 2025